**Richard P. NEWHOUSE, Plaintiff,**

v.

**McCORMICK & CO., INC., Defendant.**

No. 4:CV94–3118.

United States District Court,
D. Nebraska.

Jan. 10, 1996.

Carol McMahon–Bois, Lincoln, NE, for Plaintiff.

Jerry Pigsley, Lincoln, NE, for Defendant.

## MEMORANDUM AND ORDER

KOPF, District Judge.

McCormick & Co., Inc. (McCormick) moves for judgment as a matter of law, for a new trial, or, in the alternative, to alter or amend the judgment in this case. (Filing 107.) After careful review, I shall deny McCormick's motion, with one exception.

I shall grant McCormick's motion for new trial as to damages only regarding Plaintiff's

claim under the Age Discrimination in Employment Act (ADEA) *unless* within ten (10) days after entry of this memorandum and order Plaintiff, through his counsel, files and serves a remittitur, consenting that the front-pay award be reduced to $158,365.96.

In other words, if Plaintiff accepts reduction of the front-pay award to $158,365.96, the motion for new trial will be denied, and Plaintiff shall be entitled to collect upon the judgment (Filing 102) as limited by the remittitur. If, on the other hand, Plaintiff fails to file a remittitur, a new trial as to all types of damages must be held regarding the ADEA claim.

## I. Background

A brief discussion of the background of this case is warranted. Richard P. Newhouse (Newhouse) claimed he was subjected to discrimination by McCormick under the ADEA and the Nebraska Act Prohibiting Unjust Discrimination in Employment Because of Age (state act).

Newhouse had a long and excellent work history as a salesman with McCormick. Due to what amounted to a reduction in force, Newhouse and other McCormick sales people in Nebraska were forced to leave McCormick's employ. Later, when seeking to fill a position very similar to the one Newhouse had previously held, McCormick hired a much younger man rather than rehiring Newhouse. Newhouse was then nearly 61 years of age.

Newhouse sued, and a jury trial was held on his ADEA claim. His claim under the state act was tried to the court.

The jury returned a verdict for Newhouse on the ADEA claim, awarding him back pay (to the date of the verdict) of $59,426.76. The jury also awarded Newhouse "front pay" (from the date of the verdict until his normal retirement date) of $206,359.00.

The jury also determined that McCormick's conduct was "willful," thus requiring the court to consider an award of liquidated damages.[1] Believing that such damages were fully justified and warranted, I awarded "liquidated damages," measured on the "back-pay" award only, in the sum of $59,426.76.

Newhouse's state-law claim, essentially identical to his ADEA claim, was tried to the court. I came to the same conclusion the jury did regarding liability and the amount of back pay. I also agreed that Newhouse was entitled to "front pay," but I awarded $84,062.00. As requested by the parties, I made advisory findings that if I had decided the front-pay issue on the ADEA claim, I would have ordered front pay in the amount of $84,062.00.

The jury awarded "front-pay" pursuant to instruction No. 8. Neither party objected to instruction No. 8.[2] The pertinent portion of instruction No. 8 regarding the issue of "front pay" informed the jury as follows:

> **Second,** you must determine the amount of any future wages and fringe benefits plaintiff would reasonably have earned in his employment with defendant if he had been hired on February 1, 1993 measured from the date of your verdict until his normal retirement, *MINUS* the amount of earnings and benefits plaintiff will receive from other employment during that time. If you decide that the plaintiff is entitled to recover damages for wages and fringe benefits after the date of your verdict, then you must reduce those damages to their present cash value. You must decide how much money must be given to the plaintiff

---

1. There was more than sufficient evidence for the jury to find that McCormick's conduct was willful. In addition to various other pieces of evidence, Newhouse articulated at least eight specific factors that would support the jury verdict of willfulness: (1) failing to follow recall procedure; (2) constantly changing justifications for not hiring Newhouse; (3) DeWitt's efforts to avoid hiring older applicants; (4) DeWitt's distribution of older applicants among the vacancies so as to limit the pool of older applicants to one per vacancy; (5) DeWitt's statement to another older applicant that he preferred hiring younger applicants; (6) making interview notes regarding Newhouse only; (7) interviewing Newhouse after the hiring decision had already been made; and (8) DeWitt's knowledge of the ADEA.

2. McCormick asserted that "front pay" was an issue for the court, not the jury. Thus, McCormick objected to submitting the "front-pay" issue to the jury, although McCormick did not object to instruction No. 8 on the grounds that it improperly stated the law.

today to compensate him fairly for his future losses.

Regarding social security· benefits that plaintiff has received or may receive in the future, you should not deduct these benefits from any award of damages you may make to the plaintiff unless defendant has proven by the greater weight of the evidence that plaintiff would have applied for social security benefits even if he had been hired by the defendant on February 1, 1993.

You are also instructed that plaintiff has a duty under the law to "mitigate" his damages, that is, to exercise reasonable diligence under the circumstances to minimize his damages. Therefore, if you find by the greater weight of the evidence that plaintiff failed to seek out or take advantage of an opportunity that was reasonably available to him, you must reduce his damages by the amount of the wages and fringe benefits he reasonably would have earned if he had sought out or taken advantage of such an opportunity.

Remember, throughout your deliberations, you must not engage in any speculation, guess, or conjecture and you must not award damages under this Instruction by way of punishment or through sympathy.

During closing arguments to the jury, Newhouse's able counsel argued the following regarding "front pay":

Front pay: The Age Discrimination Act allows for the compensation of the victims that have been wronged by age discrimination from the date of the discrimination— Well, from the date of verdict until retirement. How much is this person going to lose? Between now and the six and one-quarter years between now and when Mr. Newhouse reaches the age of 70, this is the figure that represent resents [sic] the amount of front pay. Now, that is measured out at the annual salary of $27,000 that McCormick pays. There is [sic] reductions from that figure. One reduction is the amount of money that Mr. New-

house now earns per month, and right now he earns approximately $400 per month. That's on the exhibit that you'll see.

He also has as to this category of damages Social Security benefits. This figure is the difference between what he would have earned at McCormick pulling out Social Security, pulling out wages, and it also includes the lost benefits, but reduces it by the amount that the company would have paid in health insurance benefits. That is how much this man has been damaged.

The amount asserted by Newhouse's lawyer was $94,737.00. Newhouse's lawyer wrote this number on a sheet of paper and displayed the paper to the jury.[3]

Newhouse's counsel arrived at her argument that the jury might award her client $94,737.00 as "front pay" in the following manner:

1. Determine the yearly gross loss to Newhouse: $31,165.92 (salary of $27,000 plus gross value of fringe benefits of $4,165.92 (12 × $347.16)).

2. Determine the yearly amount Newhouse would have earned elsewhere: $16,008 ($5,616 earnings from other employment (12 × $468.00) and $10,392 (12 × $866.00) received from social security).

3. Subtract $16,008 (earned elsewhere) from $31,165.92 (salary plus fringe benefits) to arrive at yearly net loss to Newhouse: $15,157.92 per year.

4. Multiply 6.25 (number of years, as estimated by counsel, until Newhouse reached age 70) times $15,157.92 (yearly net loss) to arrive at $94,737.00.

During their deliberations, the jury sent a written question to the court. The question asked the court to tell the jury the amount of "front pay" Newhouse's counsel had requested during closing argument. (Filing 87.) Newhouse was willing to inform the jury of the amount, but McCormick objected. The

---

3. The court reporter did not take down the handwriting on the piece of paper, and the piece of paper was not marked as an exhibit. However, in the briefs of the parties on this issue, Newhouse's counsel does not deny this is the figure she mentioned. *Compare* Br.Supp.Def.'s

Mot.J.Matter of Law, New trial or, Alternative, Alter or Amend J. at 4 *with* Pl.'s Br.Opp'n Def.'s Mot.New Trial & /or Amendment to J. at 4. The amount stated in the text is consistent with my recollection of what counsel wrote down.

pertinent part of the exchange among counsel and the court on this issue was as follows:

THE COURT: Now, let me visit with you for just a moment about—It may make sense to tell them what plaintiff argued rather than—I mean, since that is a specific number, it may make sense to give them that number so they don't speculate about what it was the plaintiff was arguing. They may simply be trying to dissect plaintiff's argument.

MS. McMAHON–BOIES: That's what I think. If we give it with the instruction that the amount to be determined is totally your determination, this is what plaintiff argued. This is that amount that appeared.

MR. PIGSLEY: Your Honor, I think that's really calling for speculation on my part, on Carol's part, on all of our parts. We don't know.

THE COURT: Well, all right, Mr. Pigsley. What would you prefer?

MR. PIGSLEY: I would say that you have to rely on what your recollection was of the argument. They had the opportunity to take notes of what she wrote down. There was an amount wrote [sic] down. I'm not so sure they understood that, and now that's not my problem that they didn't understand that, and I don't think we should clarify what opposing counsel told them, and if they didn't understand what opposing counsel wrote on the sheet where she told them in closing argument, I don't think that's our responsibility.

THE COURT: Well Mr. Pigsley, I don't disagree with many of the things you said. I guess from your perspective, the issue is whether you would rather have them know the number than guess wrong high. But—

MR. PIGSLEY: Or guess wrong low. I don't know.

THE COURT: Well—

MS. McMAHON–BOIES: They are having to figure it out by the stipulation, it's going to come a lot higher than what I had because I gave the defendant all its credits, and they are not going to do this. They are going to look at what his annual salary is and times it.

MR. PIGSLEY: Also, maybe trying to figure out what present value is.

MS. McMAHON–BOIES: Could be.

MR. PIGSLEY: I don't know how they are supposed to figure out present value from what they got.

MS. McMAHON–BOIES: I should have argued that better. I should have told them that forget that altogether, but I didn't.

MR. PIGSLEY: Well, I'm not going to ask any questions about what your argument is, but I think that I don't think it's appropriate to give them a number.

THE COURT: Well, I won't then. What I will do—hang on just a minute.

MR. PIGSLEY: Your Honor, I think your original thinking on this was right on the point because where does it end?

THE COURT: Hang on just a minute. I propose giving them an instruction that simply says, "You are instructed that you are to remember the arguments of counsel as best you can."

MS. McMAHON–BOIES: Okay.

MR. PIGSLEY: I would have no objection to that, Your Honor.

MS. McMAHON–BOIES: Your Honor, I would ask they been [sic] given the figures.

THE COURT: All right. I won't give them the figure they are seeking for a couple of reasons, given the objection of the defendant. First of all, it essentially calls for a read back of an argument, and to put that argument into fair context for the defendant as well as the plaintiff, would be difficult [and] giving one number' [sic] in my opinion could be prejudicial to the defendants. That's primarily the reason for my ruling.

I'm going to add, however, that I'm not sure that, and this is a tactical call by defendants, but I'm not sure that defendants are making the right choice, but that's the defendant's choice to make in this circumstance. As a consequence, I will give the instruction, "You are instructed that you are to remember the arguments of counsel as best you can," and I will leave it at that. Anything further, counsel?

MS. McMAHON–BOIES: No, Your Honor. Thank you.

MR. PIGSLEY: No, Your Honor.

As a consequence, the jury was told simply that "you are to remember the arguments of counsel as best you can." (Filing 87.)

As noted, the jury returned a verdict for Newhouse, awarding front pay of $206,-359.00. On the date the jury returned its verdict (October 6, 1995), Newhouse, who was born on February 2, 1932, was approximately 63 years, 8 months old. In other words, on the date the jury returned its verdict, Newhouse had about 6.33 years remaining until his 70th birthday.

The parties stipulated that "[h]ad the plaintiff been hired instead of Mike Soflin at the same salary as Mike Soflin he would have earned the following: $2,250 per month." (Ex. 24.) The parties further stipulated that Newhouse was then earning $468.00 per month in wages from other employment, and he was receiving $866.00 per month in social security benefits. (*Id.*)

The parties also stipulated that Newhouse's health insurance would cost him $44.30 per month if he were employed by McCormick, whereas without such employment, health insurance would cost Newhouse $347.16 per month. (Ex. 27.) The net benefit of the health insurance fringe benefit to Newhouse was therefore the difference between what he was paying for health insurance ($347.16) and what he would have paid for health insurance if employed by McCormick ($44.30). The net health insurance benefit was thus $302.86.

Newhouse presented no expert economic testimony of any kind. McCormick likewise presented no expert economic testimony of any kind.

At the time of the verdict, Newhouse, who was an extremely credible witness, was a vigorous-appearing 63-year-old man. He loved his work, and he specifically loved working for McCormick. He had been very successful working for McCormick, earning one of McCormick's most prestigious awards for sales excellence. Newhouse had worked since he was 13, and he testified that he was "lost" without a job. He further testified that he had no plans to retire, but he did not testify as to what his normal retirement date was likely to be.

The evidence revealed that Newhouse had made efforts to mitigate his damages and was working part time. The evidence further revealed that Newhouse was receiving "early" social security benefits. He applied for such benefits after he was unable to find other full-time employment and after McCormick refused to rehire him. As the finder of fact on the state law claim, I was convinced Newhouse would not have applied for social security benefits had he been rehired by McCormick. I was further convinced, as fact finder, that Newhouse would have worked to age 70.

## II. Discussion

McCormick argues that the verdict regarding "front pay" was excessive, and, accordingly, that I should grant the motion for new trial. I agree that the jury's verdict as to "front pay" was excessive, but I do not believe the verdict was the product of passion or prejudice.

Thus, I find and conclude that an order of remittitur in the sum of $158,365.96 is a more appropriate remedy. *Brunnemann v. Terra Int'l Inc.*, 975 F.2d 175, 178 (5th Cir.1992) (in an ADEA case where the jury verdict was excessive but not the product of passion or prejudice, an order of remittitur was the appropriate remedy); 11 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2815, at 159–171 (1995). *See also Johnson v. Rogers* 621 F.2d 300, 306 (8th Cir.1980).

### A. Excessive

A verdict is "excessive" when it is "shown to exceed 'any rational appraisal or estimate of the damages that could be based upon the evidence before the jury.'" *Brunnemann*, 975 F.2d at 178 (quoting *Kolb v. Goldring, Inc.*, 694 F.2d 869, 871 (1st Cir. 1982) in turn quoting *Glazer v. Glazer*, 374 F.2d 390, 413 (5th Cir.), *cert. denied*, 389 U.S. 831, 88 S.Ct. 100, 19 L.Ed.2d 90 (1967)).

In order to determine whether the verdict was excessive, one must determine what amount the jury could have awarded based "upon the maximum permissible inferences from the evidence adduced at trial." *Brunnemann*, 975 F.2d at 178. Any award greater than that amount would by definition

be "excessive." In accordance with instruction No. 8, I have determined the maximum amount in this case to be $158,365.96. I arrived at this figure as follows:

1. Determine the yearly gross loss to Newhouse: $30,634.32 (holding salary of $27,000 plus net value of fringe benefits of $3,634.32 (12 × $302.86) constant into the future).

2. Determine the yearly amount Newhouse would have earned elsewhere: $5,616.00 (holding earnings from other employment (12 × $468.00) constant into the future).

3. Subtract $5,616.00 (earned elsewhere) from $30,634.32 (salary plus fringe benefits) to arrive at yearly net loss to Newhouse: $25,018.32 per year.

4. Multiply 6.33[4] (number of years left until Newhouse reached age 70) times $25,018.32 (yearly net loss held constant) to get $158,365.96.

In arriving at this amount, a number of explanations and related comments are in order. I turn to those observations next.

■ First, although the jury was charged to reduce any award to "present value," it would have been within the range of permissible inferences, and within the scope of the present-value instruction as well, for the jury to conclude that any interest rate which might otherwise drive a discount would be totally offset by such things as price inflation and real wage increases such that $158,365.96 was the present value of Newhouse's future losses. *See, e.g., Jackson v. City of Cookeville,* 31 F.3d 1354, 1360–61 (6th Cir. 1994) (concluding that district court abused its discretion in reducing front-pay award because a "reasonable approximation of [present value] can be obtained by simply multiplying his present salary by eleven [remaining years of work] and neither including future pay raises nor applying a discount rate"); *Howard v. Chesapeake and Ohio Ry. Co.,* 812 F.2d 282, 287 (6th Cir.), *cert. denied,* 484 U.S. 820, 108 S.Ct. 78, 98 L.Ed.2d 40 (1987) (affirming award of future damages where no present value instruction given based upon "total offset" approach). *See*

also *Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. 523, 544–46, 103 S.Ct. 2541, 2554–55, 76 L.Ed.2d 768 (1983) (discussing "total offset" approach); *Riha v. Jasper Blackburn Corp.,* 516 F.2d 840, 843–44 n. 4 (8th Cir. 1975) ("If the present value of the dollar is diminished in purchasing power, this fact may be considered by the jury...."); G. Michael Fenner, *About Present Cash Value,* 18 Creighton L.Rev. 305, 313–16, 328 (1983) (discussing approach, and concluding that the "total-offset approach is fair, efficient, and simple").

■ Second, consistent with instruction No. 8, the jury could also have determined that it was inappropriate to deduct social security earnings from the front-pay award. The jury was instructed, without objection, that "you should not deduct these benefits from any award of damages you may make to the plaintiff unless defendant has proven by the greater weight of the evidence that plaintiff would have applied for social security benefits even if he had been hired by the defendant on February 1, 1993." *See, e.g., Guthrie v. J.C. Penney Co., Inc.,* 803 F.2d 202, 209 (5th Cir.1986) ("Most courts have refused to deduct such benefits as social security and unemployment compensation from ADEA awards.") (citations omitted). The evidence was sufficient for the jury to conclude that Newhouse would *not* have applied for social security benefits had he been rehired.

■ To the extent McCormick argues that Newhouse did not properly mitigate his damages generally, and specifically that Newhouse failed to properly mitigate his damages in order to maintain his eligibility for social security benefits, I am completely unpersuaded by McCormick's arguments.

There was ample evidence from which the jury could have concluded that Newhouse mitigated his damages. Newhouse applied to a variety of food brokers for work. He went to Nebraska Job Service. He took a part-time job. As to the social security argument, the jury could have believed that Newhouse sought social security benefits only

---

4. In her argument, Newhouse's counsel assumed that he had 6.25 years remaining until age 70. I believe the evidence supports the inference that

Newhouse had approximately 6.33 years remaining until age 70.

after he was unable to find other full-time employment.

Conversely, the jury, following instruction No. 8, would have been obligated to consider Newhouse's earnings from other employment when calculating future losses. Indeed, Newhouse's earnings at the time of the jury verdict were highly probative of what he would have or could have earned in the future. Certainly there was no evidence that would have permitted a jury to totally disregard those earnings. Accordingly, it is appropriate to deduct those earnings from the future income stream as required by instruction No. 8.

■ Third, when computing "front pay," the jury had no basis for using a starting salary figure in excess of $27,000 per year. Indeed, the parties stipulated that "[h]ad the plaintiff been hired instead of Mike Soflin at the same salary as Mike Soflin he would have earned the following: $2,250 per month." (Ex. 24.) Although there was a passing reference to the fact that Soflin might have earned as much as $30,000 sometime after he was hired, that evidence was never related to Newhouse in a meaningful manner. Thus, it would not have been reasonable for the jury to ignore the stipulation of the parties and assume it could start the "front-pay" calculation at a rate of more than $27,000.[5]

■ Fourth, the evidence did not warrant a finding that Newhouse would work beyond age 70. Therefore, there was no nonspeculative basis to compute "front pay" upon the assumption that Newhouse would work past age 70. I stress that I do not hold as a categorical matter that a jury could never award "front pay" based upon competent

proof that a worker might reasonably be expected to work past age 70. I hold only that there was no such proof in this case. Specifically, Newhouse gave no testimony that he had any intention of working past age 70.[6]

Indeed, the lack of evidence that Newhouse would work past 70 is undoubtedly why counsel for Newhouse argued in closing that age 70 was Newhouse's probable retirement date. In this regard, I have been unable to find any cases upholding front-pay awards beyond age 70 where, as here, there was no specific proof on the subject. *See, e.g., Hybert v. Hearst Corp.,* 900 F.2d 1050, 1056 (7th Cir.1990) (reversing "front-pay" award for 67–year–old man calculated to age 72, stating, "No record evidence speaks to whether advertising space salesmen … generally work to age 72, nor whether [plaintiff] in particular could or would have done so…."); *Linn v. Andover Newton Theological Sch., Inc.,* 874 F.2d 1, 9 (1st Cir.1989) (reversing award of "front pay" to 62–year–old man, adopting "bright line" cut-off rule of age 70 urged by defendant in the absence of evidence to the contrary, and remanding for entry of front-pay award calculated to age 70).

I recognize that the ADEA no longer ceases protection at age 70. 29 U.S.C. § 631(a) (1995), as amended by section 2(c) of the Age Discrimination in Employment Amendments of 1986, Pub.L. No. 99–592 [H.R. 4154], 100 Stat. 3342 (Oct. 31, 1986). I further recognize that the age for full social security benefits is rising to age 67, 42 U.S.C. § 416(*l*)(1)(E), and, as a general rule, workers might be expected to retire somewhat

---

5. As discussed earlier, it was reasonable for the jury to consider the likelihood of wage increases *in the future* when determining present value. The point here is that the jury could not *start* the front-pay calculation assuming a specific wage rate in excess of $27,000 when there was no competent evidence to support such a starting point.

6. A jury could reasonably have believed that Newhouse would have worked to age 70, as his counsel argued. *Doyne v. Union Elec. Co.,* 755 F.Supp. 866, 871 (E.D.Mo.1991) (reducing front-pay award to age 65 for employee who was approximately 64 years of age and receiving social security benefits), *rev'd, Doyne v. Union Elec.*

Co., 953 F.2d 447, 451 (8th Cir.1992) (reversing trial court's reduction of jury's front-pay award and concluding that front-pay award to age 70 was justified); *Koyen v. Consolidated Edison Co.,* 560 F.Supp. 1161, 1169 (S.D.N.Y.1983) (awarding front pay to age 70 on application of 68–year–old man). For example, Newhouse was a vigorous-appearing 63–year–old man who loved his work and loved working for McCormick. He had been very successful working for McCormick, earning one of McCormick's most prestigious awards for sales excellence. Newhouse had worked since he was 13, and he testified that he was "lost" without a job. He further testified that he had no plans to retire.

later in the future. 2 Howard C. Eglit, *Age Discrimination* § 8.27, at 8–129 n. 628 (1995). I thus agree that there is no categorical reason why, in the proper case, a judge or jury might not properly award front pay beyond age 70. *Id.* But it is also true that "the data disclose that workers continue to retire at earlier—rather than later—dates." *Id.*

Accordingly, given the lack of precedent for awards beyond age 70, the absence of specific evidence that Newhouse would have worked past age 70, the general recognition that workers are retiring sooner rather than later, and the concession of Newhouse's counsel that age 70 was the appropriate retirement age, a "front-pay" award reaching beyond age 70 cannot stand.

■ Fifth, the fact that the court, as fact finder, would award less front pay does not establish that the court's judgment sets a threshold above which any jury award would be excessive. The same is true regarding Newhouse's lawyer arguing the $94,737.00 figure to the jury.[7]

■ While such information provides useful insight on specifics (such as the date Newhouse was likely to retire), the proper test is not what others might have thought regarding the amount of front pay; rather, the test is *what amount could the jury have awarded based "upon the maximum permissible inferences from the evidence adduced at trial."* *Brunnemann*, 975 F.2d at 178 (emphasis added). I must follow this approach because it "is the only theory that has any reasonable claim of being consistent with the Seventh Amendment." 11 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2815, at 167–68.

■ Sixth, to the extent McCormick argues that "front-pay" damages should not be awarded at all, or should be greatly reduced, because Newhouse has received liquidated damages, I reject McCormick's argument.

The law on the relationship (if any) between liquidated damages and "front pay" is not clear. 2 Howard C. Eglit, *Age Discrimi-*nation § 8.26, at 8–123–8–126 (collecting cases). I am aware of no law in this circuit which holds that an award of liquidated damages precludes an award of front pay. *See, e.g., Nelson v. Boatmen's Bancshares, Inc.,* 26 F.3d 796, 802–03 & n. 1 (8th Cir.1994) (affirming front-pay award and reinstating liquidated-damage award). Moreover, to the extent that there ought to be some comparison between the amount of the award of "front pay" and the amount of the award of "liquidated" damages, suffice it to say that I made such an analysis when deciding the proper amount of the remittitur. Under the circumstances of this case, no further reduction would be justified.

### B. Not the Product of Passion or Prejudice

■ If a jury verdict is driven by "passion or prejudice," it is not appropriate to order a remittitur because no part of the jury verdict is reasonable. 11 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, et al., *Federal Practice and Procedure* § 2815, at 165. This is so because such passion or prejudice "may have infected the decision of the jury on liability, as well as damages." *Id.* (citations omitted). *See also Everett v. S.H. Parks & Assocs., Inc.,* 697 F.2d 250, 253 (8th Cir.1983). It is also true because passion or prejudice may have infected the entire calculation of damages.

■ I find nothing to indicate that the jury verdict in this case was driven by passion or prejudice. There were no significant errors by counsel or the court. The jury was attentive, and the pertinent instruction (instruction No. 8) was given to the jury without objection by either party. The case was well tried by both sides.

To the extent that McCormick suggests the relatively large size of the front-pay award is evidence of "passion or prejudice," I reject McCormick's argument. Given the utter lack of any other evidence to suggest the jury was improperly swayed, the mere size of the award does not persuade me that the verdict was driven by passion or prejudice.

---

7. Newhouse's lawyer may well have had a tactical reason for using this number. Counsel's arguments can be fairly understood to mean that she was suggesting the lowest, not the highest, number the jury could award for front-pay purposes.

The jury's determination of the proper amount of "front pay" required the exercise of the rule of reason. For example, instruction No. 8 directed the jury in part that "you must determine the amount of any future wages and fringe benefits plaintiff would reasonably have earned in his employment with defendant...." It is, obviously, quite possible for a jury to misapply the rule of reason without in any way acting out of passion or because of a prejudicial error. *See, e.g., Datskow v. Teledyne Continental Motors*, 826 F.Supp. 677, 691 (W.D.N.Y.1993) (rejecting argument that award of 107 million dollars for pain and suffering premised on a "reasonableness" instruction was evidence of passion or prejudice, and ordering remittitur in a greatly reduced amount). Absent strong corroborative evidence, one simply cannot infer "passion or prejudice" from a jury's misapplication of the rule of reason regarding the issue of damages.

Accordingly,

IT IS ORDERED that:

(1) The motion for judgment as a matter of law, for a new trial, or, in the alternative, to alter or amend the judgment (Filing 107) is denied, except as indicated in the following paragraph;

(2) The motion for new trial (Filing 107) as to damages only regarding Newhouse's claim under the Age Discrimination in Employment Act (ADEA) will be granted *unless* within ten (10) days after entry of this memorandum and order Newhouse, through his counsel, files and serves a remittitur, consenting that the front-pay award be reduced to $158,365.96.